May it please the Court, my name is Robert Taitz and I'm here on behalf of Can you see your notes there? It's pretty dark, isn't it, for you? Oh, no, I can see okay, even with the rain. My name is Robert Taitz, I'm here on behalf of the appellant in this matter, Federal Express Corporation. And what this case involves, originally, as stated in the complaint, was two international shipments of computer modules that were coming from Hong Kong right here into Pasadena, as a matter of fact. And the parties, it was filed in state court, we removed the matter, Federal Express removed the matter of a federal court, the parties each made their initial disclosures of documents, and at that point, Federal Express filed a motion for summary judgment with regard to those two international shipments. In that motion, we argued that I think I know all that. Why don't you go to the heart of your matter? Well, the heart of it is that in the motion, we argued that this matter was governed by either Montreal Protocol 4 or the Hague Convention, or, if neither of those applied, to unamended Warsaw. In the opposition brief, of course, the other side argued that MP4 did not apply, that Hague did not apply, that the only treaty that applied was unamended Warsaw. Based on the evidence that was submitted in opposition to our brief, just to simplify the matter, we stated in our reply brief that for the purposes of this motion only, Federal Express concedes that this matter is governed solely by the Warsaw Convention. The judge granted summary judgment with regard, partial summary judgment, with regard to the two shipments originally stated in the complaint. But because Continental submitted evidence in their opposition brief of two other shipments and had copies of airway bills that did not contain the weight of the shipment, which is an Article VIII requirement, the judge denied the motion with regard to those two shipments. Well, in effect, seemed to do more than deny the motion, because in the way that the law of the case doctrine was applied later, it wasn't simply a denial of your motion. It was, okay, this is the law for the case. And I think that's the grievance you're trying to raise. That's correct, Your Honor. And it really, a second motion was filed with regard to those shipments 3 and 4. Similar arguments were made. Again, we submitted our versions of airway bills with the weight, and the judge, in our reply brief again, we said, we believe based on our evidence that we should prevail even under unamended Warsaw, and that motion was denied for factual issues. There were, the judge found that we hadn't submitted sufficient evidence to show when the weight was entered, so there were factual disputes. And as Your Honor points out, after some mediation sessions, where the dispute came about was later, in July of 2003, in conferences with the judge, with the district court judge, the judge said, where are we now? And Federal Express's position was, well, we still have the issue of what law applies in this case if we're going to go to trial. And the judge then cited, and there's a July 9, 2003, order in the record at page 257 saying, well, that issue is decided under the law  that unamended Warsaw is now the law of the case, and basically told us we have no right to bring that argument up anymore in her courtroom. Said, of course, we were free to come to the Ninth Circuit, and here we are. So our position on that. How much money is involved in this? The four shipments total about $200,000. The way the judgment was entered, our liability, Federal Express's liability was limited for the first two shipments, so that was only a few hundred dollars, and judgment was entered for about $101,000 on shipments three and four. Our argument is simply that we agree with the judge in the district court that, yes, the law of the case doctrine is discretionary, and she cited the city of L.A. case out of the Ninth Circuit for that proposition. But the reason we think it's an abuse of discretion is that, number one, Federal Express never conceded the applicability of Warsaw for the entire case. We were ñ we narrowed it down to the motions that were filed. I understand your position on that. Well, when was the ñ when did you bring up the fact, again, that the Hague and the Montreal amendments would apply? Well, the next briefing with the Court was in July of 2002. There was a joint status report that was filed that's contained in Continental's excerpts. Well, at the time of the hearing, as I understand it, there were the two that you had that were specifically identified in the complaint, and that's what you were making your motion about. But then Continental brought up two more. And what was your position at that time? At that ñ in the first motion, our position was that those two shipments were not the subject of this case. We had received initial disclosures that said nothing about those shipments. The complaint said nothing about those shipments. So our initial position at the time of the first motion, in August of 2001, was that these shipments have nothing to do with this case. We'd never heard that these shipments were an issue. But once we were informed that these shipments were now ñ and once the judge said, okay, I'm going to allow these shipments to be part of this case, that's when we did our research, found our copies of airway bills for those two shipments, and filed the second motion for summary judgment, which was heard in November of 2001. Now, was the first one actually heard where they presented the extra two? Was it a hearing, or was it all on paper? It was all on paper. It was all on paper, Your Honor. So there's no transcript of a hearing, because it was taken on the papers. Continental has argued that, taking the scenario we just described, that FedEx never went back to the district court and said, now wait a minute, this is all based on a mistaken premise here, and sought by way of motion for reconsideration or otherwise to bring that attention ñ that to the attention of the district court. What's your response to that? Our response to that is, with regard to the first motion, what the judge allowed Continental to do was introduce these additional two airway bills into the case, two additional shipments into the case. At that point, what we needed to do is now do our own research to find out if we had copies of those airway bills, and it wasn't so much a question of what law applied. We believed that if we could find airway bills that had the weight on them, we would prevail, even under unamended Warsaw, just as we had on shipments one and two, which is why in the second motion we filed, I will admit, a very similar motion, making the argument that we put those two air bills in front of the court, they both contained the weight that we believed satisfied Article VIII, and we expected the judge to grant the motion just as she did in the beginning. It was only after the second motion was denied, mediations occurred, joint status report was filed, and then we had the conference with the court in July that we realized, this is now July of 03, that's when we first realized that the district court judge was not going to allow us to make an argument as to which law applies at trial. And that is the... The effort was made at that point to persuade the district judge that you had not made the concession that she apparently thought you had made. That was made, we did make that statement in the July 2002 joint status report, but the first telephone conference with the judge didn't occur until July. It was July 9th of 2003. And that's when we, over the telephone, counsel and the district court judge discussed the case. We discussed the issue that Continental's appeal relates to, and we discussed the issue that our appeal relates to. Now, I'm having a little trouble getting the chronology here. When was the first motion decided on the papers? No hearing, right? That's correct, Your Honor. Okay. When Continental brought up the fact there were two other bills that they wanted to argue about, about when was that? That was in their opposition brief to our first motion for summary judgment. Date, what date? I can tell you exactly when that was. The hearing was in August, and the declaration. I thought there was no hearing. I'm sorry. Well, the order. I'm sorry. You're right, Your Honor. The order was issued in August of 2001. The declaration that they submitted was dated June 22nd of 2001. And the documents that were attached to that declaration, which was the Federal Express Security Department file, were documents that Federal Express had produced on April 10th of 2001, approximately two months earlier. And that's where Continental got copies of these two additional airway bills and put them in as an opposition brief. Then you filed your response when? Our reply brief was then filed on July 12th of 2001. And in that reply, did you make any argument about the Hague or Montreal applying? No. As a matter of fact, Your Honor, that's where we conceded, because of the fact that Continental did not submit any copies of an airway bill with regard to the two shipments that we believed were at issue. We, just to simplify matters, said for the purposes of this motion only, we'll concede that undemanded Warsaw applies. However, we believe that we prevail under undemanded Warsaw because the only evidence before the Court were the copies of the airway bill that Federal Express submitted. When you say for the purposes of this motion, then that really included the other two waybills, isn't it? Because that was now part of the motion. Well, we argued that the other two waybills should not have been included, should not have been considered by the Court. We made the argument, and I submitted in a reply declaration the initial disclosures made by Continental, which didn't mention the other two shipments. And so I made the argument in my reply brief that those two airway bills, those two shipments should not be considered at all by the Court. I understand that. But no argument was made at that point about which law applied, except for the fact that we concede for the purposes of this motion, and this is the motion we're talking about in which they're trying to get two additional waybills in. That's correct, Your Honor. I have a law that seems to me that this is really more a question rather than a law of the case of waiver, because I don't think you presented that argument. Well, we presented it. As part of that motion, and these two waybills were a part of that motion. They, in the end, that's true. Obviously, we argued against that in our reply brief, but in the end, the judge did allow them. We did make. Where's the transcript where it says that this concession is limited to this motion? Where is that? It's not a transcript because there was no hearing, Your Honor, but it's contained in Federal Express's reply brief, and it's right there on page 114 of Federal Express's excerpts of record, lines 22 to 24. This was in our reply brief. As a matter of fact, it was in the introduction to Federal Express's reply brief. You see, the problem I have with that is that this now is a part of that motion having been brought in. She hadn't ruled on it yet, but Continental is arguing that's part of the motion, and you're saying in your reply brief that for the purposes of this motion, we agree that the original Warsaw applies. Well, that seems a problem to me. Our position on that would be that we were taking a chance on this motion that if the judge didn't accept our evidence or found that there was issues of fact, that we would lose that motion, but we did not, Federal Express certainly did not intend to waive that issue for purposes of trial. That wasn't our intent. This judge obviously disagreed. But even under the city of L.A. case that the district judge cited, you know, it talks about reconsideration of legal questions previously decided. You see, you didn't make that clear. That's why she got frustrated. This judge is a very smart person. Yes, I agree with that, Your Honor. Very smart, let me tell you. And she made certain statements that, well, this is it. You know, we're not going to come back at it again. She did. That's right. She did say that in July. So what's wrong with her saying that? Well, I guess the... I guess our argument, Your Honor, is simply that Federal Express did not waive... It's a safer person's argument for no other reason whatsoever, you know. We don't waive any other rights, any right to bring this up at trial. I think, Your Honor, what does happen in summary judgment motion practice, oftentimes with factual issues, the parties will say, for the purposes of this motion only, we'll admit facts A, B, and C, but we think we still win. And I think that was the intent. You know, I don't remember seeing that in summary judgment motions. I mean, there was no... Certainly, there was no affidavit submitted with regard to this because this was a legal issue. This question, you know, I've always looked upon FedEx as just the, you know, the pinnacle of excellence. You know, you get a package, and you wonder where it is, and then you just call, and you give them a number, and they tell you where it is. They know exactly where it is. So how do you lose four packages? Well, unfortunately, Your Honor, FedEx now is shipping about 3 million packages a night, and while they are awfully good, and to me, it's amazing what they can get from point A to point B, there's just the inevitable reality of maybe human error. I don't know what it is. It's a tiny percentage of the packages that don't make it where they're supposed to be the next day, but it does happen. They never found those packages. Now, there was a security department. The reason there was a security department file that was produced at Continental was because the Federal Security Department did look into it. They went to the question, the employees who might have touched the package. They went to the consignee's location and talked to them, and it was just one of those situations where, unfortunately, nobody knew what happened. One thing that I, with regard to that motion thing, what you're saying, as I understand it, is that you lose your motion for summary judgment on that basis, but that doesn't mean because you lose that motion that for purposes of trial later that you can't then bring up the Hague and the Montreal. Exactly. That's exactly our argument, Your Honor. That's right. And I believe that the law of the case doctrine talks about legal issues that have been previously decided. The judge never made it, and there was no hearing on it. There was no discussion of what law applies. It was just she took our concession and our reply briefs for the purposes of that motion and then decided later on that she wasn't going to hear any more argument on that matter. So I reserve my time as far as responding to the other motions. It was not a motion on the part of Continental. If it had been a motion on the part of Continental and a failure to bring this up, it seemed like that would be a different deal because summary judgment would be granted. If Continental had filed a summary judgment motion against Federal Express, it might have been a different situation. They never did file a summary judgment motion. They just responded and opposed Federal Express's motion. But unless there's more questions, I'll save my time to respond to Continental's appeal. May it please the Court, Your Honors. Bernadette Chawla for the Plaintiff Appellee, Continental Insurance Company. Your Honors, the portion of the judgment appealed from Federal Express should be affirmed because Federal Express simply hasn't shown error on the part of Judge Minella. The problem we have here is that there were two hearings for partial motions for summary judgment in 2001. The next thing we have is in 2003, a dispute with Judge Minella as to whether the law of the case doctrine applies to concessions made during those motions for summary judgment. We do not know what happened at the – during the time those motions were briefed, whether there was a hearing or not. What happened during mediation, whether there were concessions made. We have a judgment appealed from that was stipulated into between Federal Express and Continental that is written on Federal Express's counsel's letterhead and submitted to the judge for signature. Now the – What is the effect of that stipulation? We've got two motions for summary judgment, two rulings on those. The effect of the stipulation is what? Well, Federal Express has essentially stipulated an entry of judgment against itself and submitted the judgment for signature to the judge with no findings of fact or conclusions of law. The effect of that is that judgment has been entered against them and they have conceded that they've agreed with the wording of the judgment. They don't put in the judgment they offer on their letterhead, we dispute this issue or we dispute that issue or this is still an open issue for appeal or based on a dispute regarding the Warsaw Convention or a choice of law issue, we're entering judgment. They just say judgment entered against us on these four waybills. No findings of fact and no conclusions of law. And they leave it to Judge Minnella to interlineate on the judgment in her handwriting a reference back to the two minute orders in July of 2003. The only thing – the only thing those minute orders show is the first one on July 9th is not transcribed. There was a teleconference call not on the record and we have Judge Minnella trying to – trying to summarize what happened, saying that there was a concession by Federal Express as to the applicable law. Then in the July 30th minute order, we have Judge Minnella talking about law of the  We don't have transcripts. We don't know – we don't know where the concession was made or – we just don't know in any of the abuse of discretion standard that – Oh, I know. I don't have any doubt whatsoever what the dispute's about. If you look at the civil minute order from July 9th, it says the court further declines defendant FedEx's invitation to, quote, revisit, close quote, its holding that the governing treaty is the unamended Warsaw Convention, which is plainly the issue being put before us by FedEx. So what's the uncertainty? The uncertainty is FedEx is claiming error. The uncertainty is where the error occurred. Because in the July 30th minute order, we have – we have Judge Minnella deciding – Telling us that she knows that the law of the case doctrine is discretionary and she's exercising her discretion to apply it. So she's applying law of the case doctrine. But if the law of the case doctrine – just accepting for the moment FedEx's argument, they've identified a flaw in that, in that they argue they never made such a concession. But they haven't – And that's what's on the subject of appeal. They haven't shown us where that error occurred. We just have – It apparently occurred right there. I mean, I don't have any doubt. The court declines to go back to the issue. The court concludes it's already decided that issue. That's not enough when we have a stipulated judgment that they agreed to enter into and we have minute order – I have to say, you're begging for trouble with that argument. But you're free to make it. Thank you, Your Honor. But we also have the July 9th minute order where this situation first arises. We don't have a hearing on the record. All we do have is another argument two years after these hearings or these motions were first briefed regarding the applicability of which case law. Federal Express has cited to – one year previously they had briefed the case again in a status report. They had talked about the issues in the case. But, again, it doesn't bring up whether an issue was conceded or not. It just goes back and talks about the choice of law issues presented in the case. Another year passes, and then we have Judge Minella making her decision regarding which choice of law applies. It just simply isn't clear based on what we have and based on the minute orders alone that we in fact – that Judge Minella in fact has committed an error sufficient to satisfy the abuse of discretion standard. As you pointed out, Judge Minella recognized she had the discretion to decide this issue. She exercised that discretion, and her decision was final. She simply applied the law of the case doctrine as it is, referring back to hearings over two years previously. We simply have Federal Express taking a chance on its arguments, as they say, in their motions for partial summary judgment, and then the outcome is for them a still-disputed outcome, and simply trying again to bring that issue before this Court to have a different outcome on their judgment. But based on what we have, where we have units – Do you suggest they need to go to trial? No. In the alternative, if this case – if Your Honors want us to go to trial, certainly. No. You're suggesting that FedEx can't bring the issues here because they entered a stipulated judgment. We don't want to – we don't want to say they did something such as arguing in the alternative that they shouldn't have done. But based – based on their concessions and their partial motions, based on our mediations, two years passing, and then a teleconference call with the judge that's not on the tele – in a minute order saying she recognizes she has discretion and she is exercising it, we don't have a showing of error based on – Well, again, there's no doubt in my mind what FedEx's argument is. Its argument is that it's not a matter of discretion. The law of the case doctrine never properly applied in the first place because they made no such concession. But they haven't shown – So what's the mystery for our purposes? They haven't shown us where they didn't make that concession because we have a two-year gap here. We have – we don't have a hearing on the record. We don't have – That's not their fault. The judge decides when she's going to have a hearing and when she's not. Certainly. But they could have briefed the issue. They could have done something to Judge Minnella to fully put more out there to show the error by Judge Minnella and show her she made a mistake. Instead, we just have Federal Express apparently July 9th raising an issue and July 30th raising it again and then entering into a judgment with Continental. We don't have anything more showing where Judge Minnella made a mistake or misapplied the law. We don't have – it doesn't show us judicial error. It's showing us – Let me change the subject altogether because you're not going to make any time with me on that argument. You might with my colleagues. Let's change the subject. Go to the underlying treaties, the Warsaw Convention, the Hagan and Montreal variants. Does Continental still take the position that, in fact, it is the original Warsaw Convention that's supposed to apply and that the Hagan and Montreal protocols do not properly apply as a matter of law? In two parts, Your Honor. Yes, secondly, we don't think we even need to get to which treaty applies for purposes of this appeal. Which treaty applies, the choice of law issue was decided by Federal Express and they made those concessions below in front of Judge Minnella. We don't even need to address that issue here on these appeals. We can fight that out with Judge Minnella, and we have fought that out before her. Now the only issue is Federal Express taking a chance in arguing in the alternative and what happened between that point in a reply brief and between the point two years later before telephonically in an untranscribed hearing before Judge Minnella when she says this is something conceded, this is now the law of the case and attempts to clarify that in her July 30th minute order. We just don't know what happened. We just don't have enough. We don't need to get to that. We've made our way back to the argument which I think I've already told you in my mind is a complete loser. So I'm not sure you're answering my question. My question is with regard to the Warsaw Convention and the Montreal and Hague protocols. Is it Continental's position that if we were simply to apply the law, which is our prerogative, that it is the original Warsaw Convention that applies? Absolutely, just because the U.S. and Hong Kong are not signatories to the same convention except for that convention. Again, we don't think we need to get to it on this appeal. I think we understand that. By the way, there are two microphones. You can stand in the middle of it. You don't have to lean over. Thank you. I think the fact that we're looking at is whether the Montreal Convention and the Hague Convention were approved at the same time. Yes. And that was all before this took place with this shipment, was it not? Yes. Well, the issue with the Hong Kong, the Montreal additional protocol, that's the second amendment to Warsaw. Right. That's the MP4 and the third one being Hague. The issue with that is although we have China and the U.S. agreeing on the original unamended Warsaw, Hong Kong is not a party to MP4, which is argued by Federal Express that it is because Great Britain adhered to MP4 in 1984. But they did not implement it until after 1997 when Hong Kong was returned to China. The problem with that is although it was agreed to be entered into in 1984 and China agreed with the United Kingdom that anything in force when we give, when we take jurisdiction over Hong Kong again will remain in effect, even though it's different on mainland China. We have an agreement, MP4, being agreed to be implemented but not actually implemented until after Hong Kong goes back to China. Well, wasn't the Hague protocol in force as far as Hong Kong is concerned, both when it was under the jurisdiction of the United Kingdom and then when it was under Chinese rule? Yes. The problem is the United States is not a party to the Hague. Well, then the United States signed the Montreal Protocol in March of 99, right? Yes, but adherence to a later amendment doesn't necessarily mean you're adhering to the original or adhering to the original Warsaw Convention doesn't necessarily mean adhering to subsequent amendments thereto unless they're specifically cited to. I thought when we signed the Montreal Protocol on March the 4th that Montreal Protocol entered in force for us, the United States, on March the 4th and it also entered, and the United States, the Montreal Protocol was enforced on the same day. So you just pick up, you start with the old Warsaw Convention and then the Hague Protocol. That adds to it and then the two are together and then you've got the Montreal Protocol. So you've just really got one treaty and you have to look for the situation where when a claim arises, whether the two parties, the shipper and the party that's providing the transportation, whether they're both bound by the same protocol. So why wouldn't it be the Hague Protocol? Because Hong Kong was under both the Hague Protocol when it was with the United Kingdom and China. And then we come along and we sign the Montreal Protocol, which then means we pick up the others and that would include, of course, the Hague Protocol. So you've got the two parties agreeing to the Hague Protocol. Isn't that the way it works? Well, no, as we all need to judge Manila, adherence to one amendment is not necessarily adherence to all prior specific amendments because each one changes the Hague Convention in specific ways. But is that true if, in this case, the Montreal Protocol makes specific reference and incorporates by reference the amendments made at the Hague, which is, I believe, what Article 15 of the Montreal Protocol says. And as I understand it, Article 17 makes the point that if you're not a party to the Warsaw Convention or, for that matter, to the Hague Protocol, but you sign on to this one because this one creates a single instrument, you've signed on to the whole lot. Not necessarily. Again, as we argued to Judge Manila, taking the reasoning of the Second Circuit in the Chubb and Fugito cases, those cases indicating that not necessarily adhering to subsequent amendments to the Hague Convention does not necessarily mean adherence to all of them because it would parse the meaning of the specific amendments. And although it encompasses only the original Hague Convention, it is not a given that it does encompass prior amendments to the Warsaw Convention. Kennedy. Didn't I say that in this Article 15 final clauses of Protocol 4? This provision incorporates by reference the revisions to the Warsaw Convention made at the Hague in 1955 and defines the resulting single instrument as the Warsaw Convention as amended at the Hague in 1955 and by Protocol Number 4 of Montreal in 1975. It tells you that it's one instrument. That's true. If you sign up on Montreal, you've signed up on all of them. But, yes, but the U.S. is a party to Montreal. That's true. But China is not a party to Montreal. Yeah, but China is a party to the Hague Protocol. Right. So then both China and the U.S. were both parties to the Hague Protocol at the time this shipment occurred. But the U.S. is not a party to the Hague Protocol. Only China is. No, they are because we entered into the Montreal Protocol in March the 4th of 1999. And once you do that, you pick up the Hague and the Warsaw Convention. Well, again, as we argued below, using the reasoning of the Second Circuit in the Chad case and the Fujitsu case, we certainly did not argue that and certainly argued that the Hague Protocol is in effect in China but not in the U.S. And the Montreal Protocol is in effect in the U.S. but not in China. Therefore, the only treaty that works between the two nations is the original unamended Warsaw Convention. And as agreed to by Federal Express in its reply papers, again, leading us to the result that we reached in the case below and then stipulated into entry of judgment. I'll reserve my time for rebuttal, Your Honor. Thank you. There's no rebuttal. I mean, on the cross-appeal? Oh, there is a cross-appeal, although we haven't talked about it to speak of at all. So I think that may be why Judge Hugg is quizzical. Okay. I'll stay my turn. Who's going to start first on the cross-appeal? You know what? I apologize. About the cross-appeal, we have the same issues. However, we have four waybills. As Federal Express discussed, two waybills. There was a confusion as to which waybills were at issue. Both parties apparently thought two different waybills were at issue and then discovered belatedly that four waybills were, in fact, at issue. Judge Minnella, we argue that there was error in this case because Judge Minnella acknowledged that Continental did not have recourse to file a motion for consideration at the time the mistake was uncovered. And as we argued in our briefs, because we have a judgment on two waybills one way and two waybills the other way, even though all four waybills have the same marks on them or the same lack of marks, the weight, the cargo, then we have a result of an inconsistent verdict. And for those reasons, there is a showing of error on the part of Judge Minnella. And that portion of the judgment should be overturned. Thank you. Thank you very much. Fascinating subject. We wanted to bring you, Your Honor, something that wasn't criminal law today. So we brought this appeal. Do we have a copy of the actual stipulation for judgment? Yes. Yes, Your Honor. Matter of fact, it is attached to Continental's excerpts of record as it's marked CR-84. It's their pages one, well, it's CR-84 with their excerpts of record. And one note with regard to that stipulation. The parties included language that said each party expressly reserves its respective rights to appeal from this judgment because both parties knew at that point that these appeals would be filed. Federal Express filed their appeal first. Continental's appeal followed, I think, two weeks later. It appears that both parties knew what was happening because both signatures on that stipulation are actually applied by the same person, the attorney for Continental. Yes. That stipulation, the idea for that stipulation really came about in talking with the judge. The judge told us that she wasn't going to address the legal issues anymore, said that really all that seemed to be left in the case was an issue of damages with regard to shipments three and four. And I've alluded to the fact, is it really worth going to trial on that issue? But certainly invited us if we wanted to appeal our respective issues to go ahead and that she'd be happy to follow whatever guidance the Ninth Circuit, you know, could provide. And so, right, both parties together drafted the stipulation because it seemed like the most expeditious way to move forward, not to waste the judge's time. Well, doesn't that sort of change it for me? What I was asking earlier about the motion for summary judgment and the fact it was denied. But now with the stipulation for judgment, it seems to put it into a different perspective. Now the stipulation for judgment is that's what the judgment is. Well, I think the error from Federal Express's point of view would be the district judge's orders of July 9th and July 30th of 2003. What does that say? Read that. The orders. Orders say. It says the court, and it's on page 257, Your Honor, of Federal Express's excerpt. I've got it somewhere, but if you've got it there, fine. Go ahead. It said, The court further declines Defendant FedEx's invitation to, quote, revisit its holding that the governing treaty is the unamended Warsaw Convention. In its replies to both motions for partial summary judgment, Defendant conceded the applicability of the Warsaw Convention and noted expressly that plaintiff had conceded the applicability of the unamended Warsaw Convention in its statement of genuine issues. That is now the law of the case. The judgment. I thought you were going to read a judgment. Oh, I'm sorry. The judgment just simply stated amounts of damages. It just says, The order that was signed by Judge Minnelli just said that that judgment be entered herein in favor of the plaintiff, the Continental Insurance Company, and against the Defendant, Federal Express Corporation, as follows. Number one, in the amount of $262 on the claim under Airbill ending in 3045, and then so forth. $234 on shipment number two, $55,000 approximately on shipment number three, and then $52,000 on shipment number four. This, Your Honor, I'm sorry, is contained under CR 84 of the Continental's excerpts of record. Well, you can see the problem I have is that where a denial of a summary judgment on an issue of law now becomes a basis for a final judgment that is stipulated to and coming before us. So we've got a denial of a summary judgment stipulated as being a final judgment. Exactly. Well, we're not appealing the denial of the motion for summary judgment. What happened, the situation that Federal Express found itself in, in this case, in July of 2003, was we could go to trial, but we were told expressly by the judge and there's a transcript from the July 30th hearing attached to Continental's excerpts, we were told explicitly by the judge that. It was stipulated to a judgment. Correct. So why don't you pay it? Well, because we believe that the reason we stipulated to the judgment, Your Honor, was that we found our only choice was either to go to trial just on the issue of damages because the judge told us she was not going to allow us to argue what law applied. We could have gone to trial on the damages and then filed an appeal, or we could have done it as we did, which was stipulate to a judgment in the amounts that we did and then file our respective cross-examination. I've never heard anybody take an appeal from a stipulated judgment. Well, the only other option, Your Honor, would have been to have a trial. No, no. 54B. Well, yes, we could have done it at that point. That's the usual way. Right. If you want to reserve something and get a decision on a legal issue, you do that. You don't file a stipulated judgment. I believe, Your Honor, because I was in on the phone conversations with the judge, I think our judge wanted us to do it this way. I think she wanted it resolved and then to have us go up to the Ninth Circuit. Well, you know, we had a judge around this town that used to tell you how to try your case while you were before him, and then he'd lose it for you. Yeah. Yeah. Pretty nice guy, too. Yeah. I understand. That's where I'd lose my cases, listening to him. Yeah. I understand. This case had been in her courtroom for a long time. There was a delay because one of the other attorneys passed away. And I understand what you're saying. That certainly would have made more sense and probably would have been the right way to go about this. But the way Federal Express viewed it was, at that point, we didn't want to waste the judge's time with the trial because we saw it as a legal issue with regard to her law, the case doctrine. She could have brought that up on 54B. We could have. I admit that, Your Honor. But she stipulated a judgment. Correct. And so then the Continental is subrogated to that, right? The reason they're in this case is they've paid money. We've got a judgment. Correct. That's nice. So then they say, well, pay us the judgment. You say, wait a minute. But I suppose, well, Continental's counsel was, we planned this together. The reason we had to stipulate a judgment that was drafted jointly was because we both agreed that instead of going to trial, we would file this and file respective appeals. So it wasn't an instance where we called up and said, hey, how about this idea, and Continental was surprised by it. This was a joint. Well, what if that judgment was sold to a third party? Bonafide, you know, just terrible. We've got a judgment against FedEx for 200 and whatever it is, $1,000. And, you know, go ahead and collect it. Well, let me, I'll sell it to you for $175,000 because I need the money and I don't want to horse around. Okay. Here's the 175. Here it is. What would be your defense? Well, I think part of the reason why we didn't believe that was going to happen, Your Honor, is that the agreement that was made with the stipulated judgment was that the first two shipments contained our limit of liability. So the amount owed was a total of $500. Continental, in their cross-appeal, has stated they don't believe that's a correct ruling. So from their view, they think they should be getting $200,000 from this case. FedEx thinks it should be about $1,000. But the reason I think both sides were confident. How much did the judgment add up to? Judgment is a little over $100,000, maybe $101,000. If the Court split the baby and hoped the party would go away. Exactly. I believe that's exactly what happened. That's right. Well, how do you – because I, unfortunately, don't have that stipulation in front of me, I'm not sure how you preserve that. Just have an agreement, we've entered a stipulated judgment, but we don't really mean it. Well, it's a stipulated judgment that two things. One, it specifically mentions the respective rights of appeal by both sides. Also, judgment L included a specific handwritten reference to her two July minute orders that came out. Well, anybody can appeal a judgment. You don't have to have a stipulation for – to appeal. Well, that's – I mean, I think the – our grounds here is that there was a – once this was signed off by Judge Minnella, the stipulated judgment, we then had the grounds we now had a final order and had the rights to appeal within 30 days, which we did. Well, that's right. Because you have a final order, because there was stipulated judgment, but now I don't see what preserves it on appeal. Well, I think the – I mean, I believe that the filing of an appeal within 30 days of the final – of the judgment being entered is – You filed it. You've got a – you filed your appeal on a judgment. Why shouldn't we affirm your stipulated judgment? Well, I guess because of the grounds raised in those two July 9th minute orders, the judgment certainly doesn't state that we agree with the July 9th minute orders. It doesn't say that it's reserved. Well, it says that the respective rights of appeal are reserved. Yeah. And if you take into – You can always appeal a judgment. Well, I think – I think we have to take an inference of – from the two July minute orders, which are incorporated into that final judgment by the handwriting of the judge. I don't – I didn't see that. Yeah. She wrote – Judge Minnella handwrote on the stipulated judgment that the parties shall designate as part of the record on appeal the court's minute orders of July 9th and July 30th, 2003. The parties shall designate as part of the record. Apparently, Judge Minnella had pretty clear in her mind what the disputes were. And maybe I'm a – a recent refugee from the practice of law. I've been strong-armed by judges, too. And they say, we're not going to deal with this issue anymore, and this is how it's going to be. Alternatively, you could have done a stipulation of facts with regard to the amounts and let her enter a judgment which might have made it clear what was stipulated to and what was not. I agree, Your Honor. There could have been a cleaner way to do this, but I definitely think that both parties and Judge Minnella knew what we were all doing. I don't think anybody was left out of the loop. I think we all knew that we had reached the crossroads, and that's why we chose this route. Yeah. She says it's stipulated the parties shall designate as part of the record on appeal the court's minute orders. That's true. Part of the record on appeal, but I'm not sure how we get by the stipulated judgment. I mean, I think my argument would be, of course, that by her reference to there, it shows her knowledge that the issues that were in dispute between the parties were those contained in that minute order, specifically the July 9th minute order, and that those were the issues – those were still issues that neither party was agreeing to by entering into the stipulated judgment. It was really just a shortcut to going to have a trial. It's a really good shortcut, isn't it? Well, it was short. It was short. Who drafted? Well, the – I believe it's on my – actually, now looking at it, in-house counsel for Federalist Press in Memphis drafted the stipulation, but it was approved, obviously, by both sides. Yeah, that's true. But it's sure – if that's what was intended, it was certainly a poorly drafted document, because only because Judge Manalo wrote that little thing on there, that's – other than that, you don't really have anything to do with it. And I think – well, I think what goes along with Your Honor's argument would be the Continental would have the same problem with their appeal. I mean, and that's why I'm saying I don't think either party intended it, because they would have no right to have their appeal either for the same reasons. That's a good argument for affirming. Well, I respectfully disagree, Your Honor, but I understand – could I spend just a minute on the cross-appeal filed by Continental with regard – they're making an argument that evidence – the shipper's copies of Shipments 1 and 2 should have been admitted by Judge Manalo in 2003. And our argument in opposition to that is simply Continental knew these two shipments were at issue. These were the two shipments that were stated in the complaint. These were the shipments that were discussed and had documents related to in their initial disclosures. And for whatever reason, their attorney didn't file them in opposition to our initial first summary judgment motion. And Judge Manalo granted our motion with regard to those two shipments. The fact that they're now saying, well, our attorney basically should have included them then but didn't. Who was the attorney then? I think it was George Hacipis was their counsel. From Memphis? No. No, they had counsel in California, Southern California. He didn't submit them. And I think if they're trying to argue that this is newly discovered evidence, I think there's plenty of cases on the Ninth Circuit that failure to file a document at the time of a motion doesn't become newly discovered evidence later down the road. And there's one case out of the Fourth Circuit which is instructive, which basically says that attorney mistake, attorney failure to file evidence in opposition to a motion doesn't give grounds down the line. If you write all this up, you'd say, yeah, well, we can see that this and then we did this stipulation and we got these scribbles on it. And they try to bring their stuff in, but they were a little too late. They sleep at the switch at Memphis and someplace else. The Federal Express was two years late in raising the argument about Hague and Montreal. Yeah. So it sounds like there's a civil procedure examined there someplace. Yes. Exactly. Well, thank you. Unless there's any other questions. Okay. Thank you very much, Your Honor. All right. Put on your galoshes. Thank you, Your Honor. Just two brief points. First of all, Mr. Lodwick was counsel for Continental before Judge Manilla, and he did pass away last week. We simply don't know and there is no evidence that Continental had some agreement with Michael Lodwick. Oh, Michael Lodwick. There's simply no evidence as to any agreement between counsel with Continental and Federal Express as to entering into a stipulated judgment or who would propose it or for what terms that would be. It's just not before us. Well, it is in writing, isn't it? Yes.  That is before us. That's what we look at. Absolutely, Your Honor. Absolutely. What happened to get there or what error occurred, if any, we don't know and is not before us. The final point I'd like to make is that there are issues regarding the Warsaw Convention and there may be a case that needs to be written about that, but this is not that case. This is a case about procedural error and there is — there just is not enough to do anything but affirm that the judgment is Federal Express. Thank you, Your Honor. Thank you. Oh, we're just judging by people like. Okay. All right. Now we'll go to the next matter, United States versus —
judges: Hug, Pregerson, Clifton